**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **JOHN W. VAN TUBERGEN, JR.**, <br><br> Appellant, <br><br> v. <br><br> **BLOCKFI, INC.**, <br><br> Appellee. | Civil Action No. 24-6404 (ZNQ) <br><br> **OPINION** |

**QURAISHI, District Judge**

 **THIS MATTER** comes before the Court upon two submissions filed by Appellant-Claimant John W. Van Tubergen Jr. ("Appellant" or "Van Tubergen"): (1) an appeal of the Bankruptcy Court's Orders Granting Wind-Down Debtors' Seventh Omnibus Objection to Claim No. 7233 and Denying Appellant's Motion for Reconsideration (the "Appeal," ECF No. 1); and (2) a Motion to Stay those Orders pending the outcome of the Appeal (the "Motion," ECF No. 13).[1]  Appellant filed a moving brief in support of the Appeal.  ("Appellant Br.," ECF No. 7.)  Appellee-Debtor BlockFi entities[2] (collectively, "BlockFi") filed an opposition brief ("Appellee Br.," ECF No. 11) and an appendix (Appellate Record ("AR"), ECF No. 11-1).[3]  Appellant filed a

---

[1] Having considered the parties' briefs with respect to the Motion (*see* ECF Nos. 13-1, 14, and 15), the Court will **DENY AS MOOT** the Motion because the Court now decides the appeal and there is no practical benefit to staying the matter, nor irreparable injury or substantial harm to the movant as a result.  *In re X-Cel Constructors of Delaware, Inc.,* 76 B.R. 969, 970 (D.N.J. 1987).

[2] Although the Court's docket for this matter shows that only BlockFi Inc. is responding to this Appeal, the Appellee-Debtors in this Chapter 11 case are actually a collection of the following BlockFi entities: BlockFi Inc.; BlockFi Trading LLC; BlockFi Lending LLC; BlockFi Wallet LLC; BlockFi Ventures LLC; BlockFi International Ltd.; BlockFi Investment Products LLC; BlockFi Services, Inc.; and BlockFi Lending II LLC.

[3] "AR" refers to the Appellate Record filed by BlockFi as an Appendix attached to its brief.  (*See* ECF No. 11-1.)  The Court cites to the record on appeal by its internal pagination.

reply brief.  ("Reply Br.," ECF No. 12.)  The Court has carefully considered the parties' submissions and decides the Appeal without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.  For the reasons set forth herein, the Court will **AFFIRM-IN-PART** and **REMAND-IN-PART** the Bankruptcy Court's Order Granting Wind-Down Debtors' Seventh Omnibus Objection to Claim No. 7233, and **DENY AS MOOT** the Motion to Stay.

## I.   BACKGROUND AND PROCEDURAL HISTORY

### A.   FACTUAL BACKGROUND

In April 2019, Appellant opened a depository account with BlockFi Lending and sought a series of loans.  (AR at 45, 273.)  The parties executed a total of thirty-seven loan security agreements ("LSA" in the singular, or "LSAs" in the plural) throughout the course of their relationship, during which Appellant borrowed approximately $40 million from BlockFi.  (*Id.* at 18–19.)  Each of the LSAs require Appellant to pledge a specified amount of cryptocurrency— either Bitcoin ("BTC") or Ethereum ("ETH")[4]—as collateral securing the loan.  (*Id.* at 19–25, 44.) The LSAs also provide that Appellant was to maintain a loan-to-value ratio ("LTV ratio") such that the outstanding principal balance of each loan was less than or equal to a specified percentage of the value of the collateral.  (*Id.* at 19–30, 45.)  The LTV ratio was calculated by dividing the dollar value of the loan by the dollar value of the collateral pledged.  (*Id.* at 86.)  Each of the LSAs also define "market value" of the collateral as either the "product or the amount of the collateral times the last trade price for that type of collateral on the Gemini website or the market value determined by BlockFi in its reasonable discretion."  (*Id.* at 46, 278, 340, 400, 424, 428, 442.)

---

[4] There are two types of Ethereum.  "ETH" denotes Ethereum cryptocurrency, not Ethereum Classic cryptocurrency.

If at any time the LTV ratio rose to a "Triggering Point," BlockFi was permitted to issue a margin call whereby Appellant had 72 hours to pledge additional collateral sufficient to bring the LTV value below 50 percent, the agreed-upon reset value. (*Id.*) Failure to pledge additional collateral after a margin call constitutes default under the LSAs. (*Id.* at 47.)[5] BlockFi would send out email notices to borrowers like Appellant in the event that the LTV ratios surpassed the applicable Triggering Point. (*Id.* at 159, 249, 252, 267.)

After entering into the LSAs, Appellant's loans reached their Triggering Points on multiple occasions. (*Id.* at 131, 249, 252, 263, 267, 274.) As a result, pursuant to the LSAs, BlockFi issued margin calls and Appellant was required to post additional collateral to avoid liquidation. (*Id.*) Appellant did not timely reply to the margin calls and BlockFi liquidated the collateral. (*See id.*)

### B.    PROCEDURAL HISTORY

After BlockFi filed for bankruptcy, on March 15, 2023, Appellant filed a proof of claim (Claim Number 7233) in an amount of $10 million for the "collateral that is owed to [him] from [his] loans due to false force[d] liquidations from BlockFi." (*Id.* at 31, 34.) Appellant claims wrongful and improper liquidations in connection with seven of his thirty-seven loans. In its brief on this appeal, BlockFi provides the following chart summarizing the seven disputed loans:

| Loan # | Loan ID | Origination Date | Loan Amount (USD) | Collateral Pledged | Required LTV | Reset LTV | Max LTV |
|--------|---------|------------------|-------------------|--------------------|--------------|-----------|---------|
| 1 | 250568f4 | 05/03/2021 | $1,856,300.00 | 64.030 BTC | 70% | 50% | 80% |
| 2 | 176fcbc3 | 05/05/2021 | $1,000,300.00 | 34.870 BTC | 70% | 50% | 80% |
| 3 | 558207a5 | 05/12/2021 | $6,300,300.00 | 3047.140 ETH | 70% | 50% | 80% |
| 4 | 1a118e43 | 07/07/2021 | $5,928,830.21 | 3334.93 ETH[11] | 80% | 60% | 90% |
| 5 | 736435a7 | 11/02/2021 | $2,298,300.00 | 72.050 BTC | 70% | 50% | 80% |
| 6 | ce7f64ed | 11/02/2021 | $1,245,949.14 | 39.050 BTC | 70% | 50% | 80% |
| 7 | 5be66333 | 11/02/2021 | $1,622,000.00 | 719.830 ETH | 70% | 50% | 80% |

---

[5] The Triggering Point was 70% for each Loan except Loan 1a118e43, which had a Triggering Point of 80%. (AR at 45.) Also, for Loan 1a118e43, the Reset LTV was 60%. (*Id.* at 68.) The Max LTV was 80% for each loan except Loan 1a118e43, which had a Max LTV of 90%. (*Id.* at 46, 68.)

On August 3, 2023, BlockFi filed its Seventh Omnibus Objection to Certain Claims.[6]  In part, the objection sought to modify Appellant's Claim to align with BlockFi's books and records, which valued Appellant's claim as $19.07 based on his account balance in his BlockFi loan account.  (*Id.* at 286.)  On September 13, 2023, Appellant filed his response challenging the Seventh Omnibus Objection and re-asserting that his claim value is $10 million.  (*Id.* at 1.)  In December 2023, BlockFi filed a reply.  (*Id.* at 84.)  BlockFi also submitted a certification of Flori Marquez ("Marquez"), BlockFi's Chief Operating Officer, in support of its Omnibus Objection.  (*Id.* at 157.)  Appellant filed a sur-reply, (*id.* at 165), and a certification, (*id.* at 176).

On January 16, 2024, the Bankruptcy Court held an evidentiary hearing and thereafter issued its decision granting the objection and fixing Appellant's claim to $19.07.[7]  (*Id.* at 272, 286.)  The Bankruptcy Court looked specifically to the language of the LSAs, observing that they "individually function as contracts."  (*Id.* at 275.)  Relevant to this Appeal, the Bankruptcy Court then addressed (1) whether BlockFi improperly liquidated Appellant's collateral because it erroneously calculated the LTV ratio; (2) whether there was missing ETH that Appellant was entitled to after BlockFi liquidated one of Appellant's loans; and (3) whether BlockFi improperly liquidated Appellant's collateral in general.  (*Id.* at 275–284.)

Addressing each argument in turn, the Bankruptcy Court held that the plain language of the LSAs provide that BlockFi could make a determination as to the market value of the collateral "in its own reasonable discretion," and that there was no support for Van Tubergen's methodology for calculating the LTV.  (*Id.* at 278.)  Regarding the missing ETH, the Bankruptcy Court found

---

[6] The actual objection is not part of the Appellate Record.
[7] Marquez testified at the Bankruptcy hearing.  (AR at 368–388.)

that Van Tubergen offered no evidence indicating that he ever deposited, transferred, or otherwise supplied that ETH to his account, whereas BlockFi offered evidence to contradict Van Tubergen's theory. (*Id.* at 281.) Lastly, the Bankruptcy Court found that the plain language of the LSAs provide that BlockFi could liquidate certain loans without giving notice and that BlockFi provided notice for all liquidations of Van Tubergen's collateral that it needed to. (*Id.* at 284.)

Thereafter, Appellant filed a Motion for Reconsideration pursuant to Bankruptcy Rules 3008, 8002, 8007, 9023 and 9024. (*Id.* at 293.) On April 25, 2024, the Bankruptcy Court again held a hearing. On May 16, 2024, the Bankruptcy Court denied the Motion for Reconsideration, ultimately concluding that it provided no basis for reconsideration. (*Id.* at 438, 440, 444). This appeal followed.

## II.    <u>SUBJECT MATTER JURISDICTION</u>

This Court has appellate jurisdiction over a bankruptcy court's final judgments, orders, and decrees pursuant to 28 U.S.C. § 158(a).

## III.    <u>LEGAL STANDARD</u>

A district court reviews a bankruptcy court's "legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for an abuse thereof." *In re Rashid*, 210 F.3d 201, 205 (3d Cir. 2000); *see In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995) ("On appeal the district court . . . may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous . . . .") (quoting Frmr. Fed. R. Bankr. P. 8013); *see also In re Great Atl. & Pac. Tea Co., Inc.*, Civ. No. 14-4170, 2015 WL 6395967, at *2 n.1 (S.D.N.Y. Oct. 21, 2015) (although Fed. R. Bankr. P. 8013 was removed in the new Federal Rules of Bankruptcy Procedure "logic still compels the same conclusion with respect to the

appellate powers of the District Court"). When addressing mixed questions of law and fact, district courts divide the questions into their respective components, applying the clearly erroneous test to factual findings and a plenary review to questions of law. *In re Brown*, 951 F.2d 564, 567 (3d Cir. 1991).

## IV.    <u>DISCUSSION</u>

Appellant raises six issues on appeal: (1) whether the Bankruptcy Court erred by failing to find or consider what Appellant believes to be the actual value of the collateral for purposes of determining the reasonableness of the LTV calculations and whether "Triggering Events" under the LSAs had in-fact transpired prior to the disputed liquidations of Appellant's collateral (Appellant Br. at 34); (2) whether the Bankruptcy Court erred in not applying Michigan law to deny or limit enforceability of various clauses in the LSAs (*id.* at 29); (3) whether the Bankruptcy Court abused its discretion by permitting BlockFi to have liquidated collateral beyond what was necessary to establish the "Required LTV" under the LSAs (*id.* at 39); (4) whether the Bankruptcy Court abused its discretion by not requiring BlockFi to produce pre-liquidation notices required under the LSAs (*id.* at 41); (5) whether the Bankruptcy Court abused its discretion by not crediting Appellant's reasonable reliance on statements made by BlockFi's representatives in connection with Loan No. 558207a5 (*id.* at 44); and (6) whether the Bankruptcy Court abused its discretion by accepting BlockFi's argument that key terms of the LSA for Loan No. 1a118e43 were the product of scrivener's error (*id.* at 44). On this last point, Appellant contends that a remand is warranted to figure out what happened with the missing ETC. (*Id.* at 46.)

The Court will address each argument in turn.

A.    **WHETHER THE BANKRUPTCY COURT ERRED BY FAILING TO FIND OR CONSIDER WHAT APPELLANT BELIEVES TO BE THE ACTUAL VALUE FOR PURPOSES OF DETERMINING THE REASONABLENESS OF THE LTV CALCULATIONS**

Appellant argues that the Bankruptcy Court erred when it found that "BlockFi applied an acceptable LTV calculation method to the subject loans." (Appellant Br. at 34.) Appellant contends that the findings by the Bankruptcy Court were erroneous because BlockFi failed to identify a reasonable valuation method and because it permitted BlockFi to merely rely on basic principles of reasonableness. (*Id.*) Appellant further argues that (1) he provided sound data to show that BlockFi conducted unauthorized liquidations, (*id.* at 35); (2) the Court erred in accepting the testimony of Flori Marquez on the issue of a reasonable calculation, (*id.* at 37); and (3) the Court should take judicial notice of certain market data that contradicts BlockFi's valuation, (*id.* at 38). In his reply brief, Appellant argues that BlockFi fails to recognize "the distinction between a purported methodology and the data inputs, *i.e.*, verifiable evidence of value, that should be required to justify the taking of adverse action against any borrower's posted collateral." (Reply Br. at 1.) Appellant takes issue with BlockFi's "failure to identify the sources of the market value data utilized in connection with the subject liquidations." (*Id.* at 2.) Appellant wants BlockFi to explain what "specific pricing metrics" were utilized to calculate the LTV ratios. (*Id.*) For the reasons that follow, the Court finds that these arguments are unpersuasive.

In its decision on the Omnibus Objection, the Bankruptcy Court concluded that

> Van Tubergen offers no explanation as to why BlockFi was obligated to utilize his desired methodology, which calculates values based upon an average of the price points on the liquidation dates, as opposed to a methodology that BlockFi deemed appropriate in its reasonable discretion—something it was explicitly permitted to do pursuant to the terms of the LSA. In its pleadings and testimony, BlockFi explained the basis for its calculations. Nothing in the record suggests that BlockFi's methodology was unreasonable. Accordingly, Van Tubergen fails to establish by a

> preponderance of the evidence that BlockFi miscalculated the LTV
> and that BlockFi improperly liquidated his Collateral.

(AR at 278–89.)

The Bankruptcy Court's interpretation of the LSAs was a legal conclusion that this Court reviews *de novo*. *See Mapother & Mapother, P.S.C. v. Cooper*, 103 F.3d 472 (6th Cir. 1996); *In re Brunswick Apartments of Trumbull Cnty., Ltd.*, 215 B.R. 520, 522 (B.A.P. 6th Cir. 1998), *aff'd*, 169 F.3d 333 (6th Cir. 1999). As noted above, Section 7 explains that there are two ways to calculate the market value of the collateral: "(a) the product or amount of Collateral times the last price for each unit of the Collateral in the Depository Account that is quoted on the Gemini website, *or* (b) the market value determined by Lender in its reasonable discretion (the 'Collateral Market Value')." (*Id.* at 45, 46 (emphasis added)). The "or" is disjunctive and signifies that there are two ways to calculate the market value. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) ("'or' is 'almost always disjunctive.'") (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). The plain language of the LSAs thus supports the notion that BlockFi's calculations were *permissible* given that BlockFi relies on the second manner to calculate the market value of the collateral. In short, the LSAs expressly allow BlockFi to use its reasonable discretion to calculate market value of the collateral and it exercised that discretion. It was not obligated to use the Gemini data as Appellant contends.

In addition to being a *permissible* method of calculation, the Court finds that BlockFi did in fact utilize its *reasonable* discretion pursuant to the terms of the LSAs. In support of BlockFi's calculations, its Chief Operating Officer, Marquez, testified as to how the LTV ratios were calculated. (*Id.* at 376–78.) Appellant takes issue with the testimony of Marquez because she "testified as to general systems and procedures" and did not have personal knowledge as to specific data. (Appellant Br. at 37.) Regarding the LTV calculation, Marquez testified that BlockFi "used

a variety of best-in-class pricing feeds that were fed in to our institutional team and that was connected to the loan platform, and then LTV values were calculated off of those pricing feeds." (AR at 377.)  Marquez then clarified her view on why the LTV calculation is "confusing" and that BlockFi looked at the "low price" of the day in question.  (*Id.* at 377–78.)  Lastly, when asked about her declaration that included data regarding the liquidation price, Marquez testified that she "looked thoroughly at BlockFi's books and records, and in addition, . . . had [the] finance team re-review all of the data that was submitted to ensure that it was accurate."  (*Id.* at 378–79.)

The Bankruptcy Court found in both its decisions on the Seventh Omnibus Objection and the Motion for Reconsideration that BlockFi utilized its reasonable discretion because it adequately explained its methodology and that there was no evidence presented by Appellant of unreasonableness.  (*Id.* at 279, 445–46.)  The Bankruptcy Court found that Marquez's testimony was based on personal knowledge and that she was credible.  (*Id.* at 446–47.)  The Court will defer to the Bankruptcy Court's findings regarding Marquez's live testimony.  Additionally, the Court finds that when calculating the LTV ratio, it is reasonable to (1) look at the low point on the day given the significant and sometimes drastic price fluctuations, and (2) consider the books and records and the fact that BlockFi's finance team reviewed the date.  Despite not naming the pricing feeds, the Court finds that BlockFi's calculations were reasonable and there is likewise no evidence in the Appellate Record that BlockFi's methodology was unreasonable.  Merely disagreeing with the methodology or asking for an explanation for more specific information does not mean the calculation was unreasonable.  Accordingly, the Court agrees with the Bankruptcy Court that BlockFi's calculations were permissible and reasonable.

## B.    WHETHER THE BANKRUPTCY COURT ERRED IN NOT APPLYING MICHIGAN LAW

Appellant next argues that the Bankruptcy Court failed to apply Michigan law with respect to his claims based on good faith and fair dealing, impossibility, and unconscionability, given that these theories are "separate and apart from a breach of contract claim."  (Appellant Br. at 29.) Appellant contends that under Michigan law the LSAs should not be enforced, and that the LSAs were "so aggressive in terms of units of Collateral sold so as to constitute a violation" of Michigan's commercial law.  (*Id.*)

It is undisputed that Michigan law governs the LSAs.  (Opp'n Br. at 25, n.7; AR at 53.) There is also no dispute that Michigan codifies the implied covenant of good faith and fair dealing and the doctrine of unconscionability.  (*See* Opp'n br. at 25–28.)  However, for reasons to be shown, the Bankruptcy Court did not err in "not applying" Michigan law.

The Bankruptcy Court's decision on the Seventh Omnibus Objection stated that Appellant's

> state law claims—premised on breach of contract and the covenant of good faith and fair dealing—are bottomed on his contention that BlockFi breached the parties' agreement—the controlling LSA.  For reasons previously discussed, this Court determines that the liquidations were conducted properly and that BlockFi effectuated the liquidations in compliance with the terms of the LSA.  Thus, Van Tubergen has failed to establish the validity of such breach of contract claims by a preponderance of the evidence.

(AR at 284.)  Therefore, the Bankruptcy Court found that as a threshold matter, based on the plain language of the LSAs, that BlockFi did not breach the LSAs.  Consequently, according to the Bankruptcy Court, there was no need to address Appellant's other state law contract claims under Michigan law.

Appellant re-raised this issue on his Motion for Reconsideration.  The Bankruptcy Court denied that motion, again concluding that "Van Tubergen's state law claims for breach of contract

and the covenant of good faith and fair dealing are undeniably bottomed on his contention that BlockFi breached the parties' agreement—the controlling LSAs." (*Id.* at 447.)  The Bankruptcy Court clarified that "there was no violation under Michigan law for claims of unconscionability or breach of contract." (*Id.*)  Specifically, the Bankruptcy Court held that "[b]ased on the evidence presented, this Court summarily determined that there was no unconscionability or breach of good faith and fair dealing.  This Court finds it unnecessary to delve further into the applicability of Michigan law.  Simply put, Van Tubergen cannot present a claim under Michigan law and an analysis under Michigan law at this time would be a futile exercise." (*Id.*)

On *de novo* review, this Court finds that the Bankruptcy Court did not err in its finding that there was no breach of the LSAs or in its non-application of Michigan law.  To state a claim for breach of contract under Michigan law, a plaintiff first must establish the elements of a valid contract.  *Pawlak v. Redox Corp.*, 453 N.W.2d 304, 307 (Mich. 1990).  Here, it is undisputed that the LSAs are valid contracts.  The dispute is to three other issues: (1) whether there was a breach of the LSAs; (2) whether there was a breach of the implied covenant of good faith and fair dealing that attaches to the LSAs; and (3) whether certain provisions of the LSAs are unconscionable.

Once a valid contract has been established, the plaintiff then must prove the terms of the contract, whether there was a breach of those terms by the defendant, and injury to the plaintiff resulting from the breach.  *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003); *see also May v. CitiMortgage, Inc.*, 648 F. App'x 567, 571 (6th Cir. 2016).  Under Michigan law, when construing a contract or one of its provisions, "the intentions of the parties govern." *First Nat. Bank of Ypsilanti v. Redford Chevrolet Co.*, 285 N.W. 221, 223 (Mich. 1935).  "To ascertain the parties' intentions, the Court looks first to the language in the written agreement." *Ordo City Hawtai Autobody Co., Ltd. v. Dimond Rigging Co. LLC*, 2015 WL 4966883 at *10 (E.D. Mich. 2015).

Intent should be discerned "in light of the surrounding circumstances and from a reading of the instrument as a whole." *DaimlerChrysler Motors, L.L.C. v. Bill Davis Racing, Inc.*, 408 F. Supp. 2d 337, 345 (E.D. Mich. 2005).  Notably, a clear and unambiguous contract must be construed "as a matter of law and enforced as written unless contrary to public policy." *Id.*  "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Id.* (citation omitted).  "Where the language of the writing is not ambiguous the construction is a question of law for the court on a consideration of the entire instrument." *Ordos*, 2015 WL 4966883 at *10.  On the other hand, "[a]mbiguous contracts generally present questions of fact for trial." *Wells Fargo Bank, NA v. MPC Inv.*, 705 F. Supp. 2d 728, 736 (E.D. Mich. 2010).

Here, the Court finds that the LSAs are clear and unambiguous.  Their relevant terms expressly provide that:

> (1) "Borrower will, at all times, maintain a loan to value ratio where the outstanding principal balance of the Loan is less than or equal to [70 percent] of the Collateral Market Value, as defined in Section 7 below";

> (2) "the market value of the Collateral in the Depository Account shall be either

>> (a) the product or amount of Collateral times the last price for each unit of the Collateral in the Depository Account that is quoted on the Gemini website, or

>> (b) the market value determined by Lender in its reasonable discretion (the 'Collateral Market Value')";

> (3) "[u]pon notice by Lender to Borrower of the occurrence of a Trigger Event . . . Borrower shall promptly . . . deposit additional Collateral into the Depository Account in such an amount as necessary to establish a loan to value ratio where the total of the outstanding principal balance of the Loan plus all other amounts due is equal to or less than [50 percent] of the Collateral Market Value" but if the "outstanding principal balance is equal to or greater than [80 percent] of the Collateral Market Value . . . Lender has the right to immediately liquidate Collateral."

(AR at 45–47.)  Section 8 of the LSAs governs default and sets out the terms for what happens when the borrower fails to deposit additional collateral upon notice by the lender.  (*Id.* at 47.)

The LSAs specifically provide that "Collateral Market Value" can be determined by Lender in its reasonable discretion.  Section 7 also provides that "Borrower agrees that for the purposes of calculating the Collateral Market Value, Lender may take into account or disregard, at its sole discretion the value of any new cryptocurrency held in the Depository Account."  (*Id.*) Based on the plain language of the LSAs, a determination as to the market value of Appellant's collateral was left to BlockFi in its own reasonable discretion.  Thus, if BlockFi exercised reasonable discretion, there was no breach.[8]  *See Franklin Cap. Funding LLC v. Viridis FSM Inc.*, Civ. No. 20-10703, 2021 WL 391337, at *8 (E.D. Mich. Feb. 4, 2021) (finding no breach because the express terms of a loan agreement were not breached).

Appellant argues that BlockFi breached the implied covenant of good faith and fair dealing that attaches to every contract.  (Appellant Br. at 30–31.)  In Michigan, statute defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing."  MCL 440.1201(2)(t).  There is an implied promise contained in every contract "that neither party shall do anything which will have the effect of destroying or inuring the right of the other party to

---

[8] The Court separately considers, *supra*, whether the Bankruptcy Court erred in its factual finding that BlockFi was reasonable in its valuation of collateral.

receive the fruits of the contract." *Hammond v. United of Oakland*, 482 N.W.2d 652, 655 (Mich. Ct. App. 1992) (citations omitted).

Notably, the implied covenant of good faith and fair dealing under Michigan law "neither overrides nor replaces any express contractual term." *Id.* (quoting *Bank of America, NA v Fidelity Nat'l Title Ins Co*, 892 N.W.2d 467 (Mich. 2016)). As already concluded, the LSAs contain express terms that are clear and unambiguous regarding BlockFi's discretion to value collateral. To the extent BlockFi complied with those terms, its compliance precludes a claim for the violation of good faith and fair dealing of the type Appellant attempts to assert here. *See id.* It was therefore not error for the Bankruptcy Court to decline to analyze Appellant's good faith and fair dealing claim under Michigan law.

Appellant also argues that the LSAs are unconscionable under Michigan law. For the reasons set forth below, the Court finds that the terms of the LSAs are neither procedurally nor substantively unconscionable under Michigan law. Appellant specifically argues that Section 7 of the LSAs and its definition of "Collateral Market Value" as either that listed by Gemini "or the market value determined by BlockFi in its reasonable discretion," should be stricken from the LSAs as unconscionable or not applied by the Court. (Appellant Br. at 31.) Appellant also argues that the following language should be removed from the LSAs: "for the purposes of calculating the Collateral Market Value, Lender may take into account or disregard, at its sole discretion the value of any new cryptocurrency." (*Id.*) If the subject liquidations and provisions were not unconscionable, Appellant argues that they were so aggressive that they violate MCL 440.1304.[9] (*Id.*)

---

[9] Section 440.1304 of Michigan's Uniform Commercial Code provides that "[e]very contract or duty within this act imposes an obligation of good faith in its performance and enforcement."

"To void a contractual provision as unconscionable, under Michigan law, a court must find *both* 'procedural' and 'substantive' unconscionability." *Henderson v. Credit Acceptance*, Civ. No. 23-12573, 2024 WL 1957329, at \*5 (E.D. Mich. Apr. 22, 2024), *report and recommendation adopted,* Civ. No. 23-12573, 2024 WL 2142992 (E.D. Mich. May 13, 2024); *Whirlpool Corp. v. Grigoleit Co.*, 713 F.3d 316, 321 (6th Cir. 2013). The most important factors in deciding procedural unconscionability are: (1) whether the economically weaker party had an alternative source with which it could contract, and (2) whether the contract term was in fact negotiated. *Pack v. Damon Corp.*, 320 F. Supp. 2d 545, 556 (E.D. Mich. 2004).

Here, Appellant entered into thirty-seven loan agreements with BlockFi and had the power each time to not assent to the agreements. The Bankruptcy Court further found based on the evidence before it that "Van Tubergen was a sophisticated investor who knew the risks of his investments." (AR at 447.) That factual finding was not clear error and will not be disturbed on appeal here. There is also nothing shocking or unconscionable about the terms of the LSAs as they were clear, unambiguous, and known to Appellant, a sophisticated investor. BlockFi was but one of many lending counterparties from whom Appellant could have borrowed money from. Accordingly, the Court finds that Appellant has simply failed to show that the LSAs are procedurally unconscionable. Consequently, because Michigan requires a showing of both types of unconscionability, and Appellant has failed to show that the LSAs were procedurally unconscionable, the Court does not reach substantive unconscionability.

In sum, the Bankruptcy Court did not err in not analyzing Appellant's claims under Michigan law. Despite possibly being a "futile exercise," as just exemplified, our *de novo* review shows that Michigan law does not save Appellant's claims. (*See id.*)

**C. WHETHER THE BANKRUPTCY COURT ABUSED ITS DISCRETION BY PERMITTING BLOCKFI TO HAVE LIQUIDATED COLLATERAL BEYOND WHAT WAS NECESSARY TO ESTABLISH THE "REQUIRED LTV" UNDER THE LSAS**

Appellant next argues that it was his understanding under the LSAs that upon default, BlockFi would liquidate collateral in a reasonable manner to re-establish the required LTV. (Appellant Br. at 39.)  As already explained, the LSAs provide that BlockFi was permitted to liquidate collateral subject to certain notice requirements if prices dropped past certain thresholds relative to the outstanding loan amounts.  Specifically, the LSAs require Appellant to maintain an LTV ratio of less than 70% (or 80% in the case of Loan No. 1a118e43) on each loan.  (AR at 45.)

As an initial matter, Appellant cites no instances when BlockFi purportedly liquidated more than needed.  According to the terms of the LSAs, BlockFi was permitted to liquidate collateral in an "amount *as necessary* to establish a loan to value ratio where the total outstanding principal balance of the Loan plus all other amounts due is equal to or less than seventy percent of the Collateral Market Value."[10] (*Id.* at 47) (emphasis added).  Notably, the LSAs do not restrict the amount of collateral that BlockFi could liquidate to achieve the seventy-percent loan to value ratio. The Bankruptcy Court's decision on the Seventh Omnibus Objection and Motion for Reconsideration did not state otherwise.  In fact, the Order sustaining the Seventh Omnibus Objection provided that "[t]he Wind-Down Debtors are authorized to take all steps necessary or appropriate to carry out the relief granted in this Order," (*Id.* at 288), which mirrors, to some extent, the language in the LSAs.  Accordingly, the Bankruptcy Court did not abuse its discretion by allowing BlockFi to liquidate collateral "beyond what was necessary."  (*See* Appellant Br. at 39.) The Bankruptcy Court simply gave effect to the clear terms of the LSAs and committed no error.

---

[10] The Court rejects BlockFi's argument that the amount it was allowed to liquidate was "within its discretion."  (Opp'n Br. at 20.)

### D.    WHETHER THE BANKRUPTCY COURT ABUSED ITS DISCRETION BY NOT REQUIRING BLOCKFI TO PRODUCE PRE-LIQUIDATION NOTICES

Appellant moreover argues that it was plain error for the Bankruptcy Court to not require BlockFi to produce copies of the notices issued prior to engaging in the subject liquidations, and that the Bankruptcy Court's disregard for this concern constitutes plain error.  (Appellant Br. at 41.)  Appellant appeals to public policy, arguing that "BlockFi Lending, as an institution, should have been forced to produce any and all requisite notices in order to declare that it complied with each LSA."  (*Id.* at 42.)

For the following reasons, this argument is unpersuasive.  First, Appellant is essentially asking this Court to reinterpret, again, otherwise unambiguous terms in the LSAs that the Bankruptcy Court already reviewed and addressed.  Additionally, it was not the Bankruptcy Court's job to "require" BlockFi to produce pre-liquidation notices, as Appellant argues.  Instead, the Bankruptcy Court simply read and applied the terms of the LSAs and held BlockFi to the standards set forth in those agreements.  The Court also finds no support for Appellant's public policy argument that BlockFi "as an institution" should have been forced to produce all the notices.  (*See* Appellant's Br. at 42.)  Appellant moreover provides no legal support for its public policy argument.

As to the terms of the LSAs pertaining to liquidation and pre-liquidation notices, the Bankruptcy Court concluded in its decision on the Omnibus Objection that

> [i]f the LTV increased to eighty percent (80%), "the lender ha[d] the right to *immediately liquidate* Collateral in such an amount as necessary to establish a loan to value ratio . . . equal to or less than seventy prevent (70%)."  In other words, once a loan's LTV hit 80%, BlockFi could liquidate the loan without giving notice.  Van Tubergen has not presented any evidence that BlockFi failed to provide the requisite notice for all liquidations of his Collateral.  Nor has he established any wrongful actions by BlockFi in the manner in which the Collateral was liquidated.  In contrast, the record

> includes evidence that confirms that BlockFi provided timely all
> such notice in advance of liquating Van Tubergen's Collateral.

(AR at 284) (citations omitted and emphasis in original). This was not error because the phrase "immediately liquidates" means that BlockFi need not provide notice to Appellant upon default in certain circumstances. According to the plain terms of the LSAs, BlockFi only needed to provide notice of a trigger event. (*Id.* at 5.) Thereafter, it could immediately liquidate collateral. (*Id.*) In fact, BlockFi was not required to provide notice if the principal balance on the loan equaled or exceeded eighty percent. (*Id.* at 46.) Thus, there was no basis for the Bankruptcy Court to add terms to an otherwise unambiguous contract requiring BlockFi to produce pre-liquidation notices. In fact, doing so would exceed judicial authority under Michigan law. *51382 Gratiot Ave. Holdings, LLC v. Chesterfield Dev. Co., LLC*, 835 F. Supp. 2d 384, 391 (E.D. Mich. 2011) (Under Michigan law, "the judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties") (quoting *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 461 (Mich. 2005)).

Notably, and fatal to Appellant's claim on appeal is that there is no evidence in the Appellate Record that BlockFi failed to provide notice to Appellant in a way that violated the terms of the LSAs. To the contrary. There was persuasive evidence before the Bankruptcy Court, and now before this Court, in the form of testimony at the Objection hearing that timely notices were provided in advance of liquidation. (*Id.* at 284; *see also id.* at 369–372.)

Accordingly, Appellant's argument that the Bankruptcy Court abused its discretion by not requiring BlockFi to produce pre-liquidation notices is not supported by the Appellate Record.

### E. WHETHER THE BANKRUPTCY COURT ABUSED ITS DISCRETION BY NOT CREDITING APPELLANT'S RELIANCE ON STATEMENTS MADE BY BLOCKFI'S REPRESENTATIVES IN CONNECTION WITH LOAN NO. 558207A5

Appellant next argues that under Michigan law, "Appellant should be deemed to have reasonably relied on BlockFi Lending's agents in seeking to safeguard the collateral from liquidation under the LSAs." (Appellant Br. at 43.) Appellant thus argues that "any governing calculations with regard to Loan No. 558207a5 should take account of the Surplus 558207a5 Collateral, which removed any doubt whatsoever as to whether BlockFi Lending was able to rightfully proceed with the liquidation of Loan No. 558207a5." (*Id.* at 43–44.)

Again, Appellant's argument misses the mark. As an initial point, the Bankruptcy Court independently examined the parties' communications and found that BlockFi agents "provided instruction and recommendation rather than confirmation as to the safety of his loan." (AR at 280.) The Bankruptcy Court also provided specific examples of the communications to find that BlockFi did not make assurances as to the safety of Appellant's loans. That determination was not clear error.

Furthermore, there is nothing in the Appellate Record to support Appellant's argument that he was assured that his collateral was safe from liquidation. In fact, the LSAs state otherwise upon the occurrence of certain events. For example, the LSAs expressly provide that upon notice of a trigger event, Appellant was to deposit additional collateral into the depository account or risk liquidation. (*Id.* at 46.) As is made clear from the LSAs, any surplus collateral not deposited into the depository account has no bearing on whether the LTV ratio falls back to a normal ratio. As the Bankruptcy Court properly concluded, "Van Tubergen presents no evidence suggesting that he deposited the Surplus Collateral 'into the Depository Account' in the 'same kind of cryptocurrency

as the original collateral' as required by the terms of the LSA.  In fact, the record shows only that additional funds were merely available in his Interest Account."  (*Id.* at 280.)

The Bankruptcy Court moreover credited Marquez's testimony that BlockFi did not have authority to use funds held in other accounts to address the margin calls and high LTV ratios, and relied on Appellant and BlockFi's prior dealings to conclude that Appellant was aware of that fact. (*Id.*)  These are all factual issues, and Appellant has not demonstrated any error by the Bankruptcy Court, much less the clear error required to disturb the Bankruptcy Court's findings.

Accordingly, the Bankruptcy Court did not err in failing to credit Appellant's belief that his collateral was safe from liquidation.

### F.    WHETHER THE BANKRUPTCY COURT ABUSED ITS DISCRETION BY ACCEPTING BLOCKFI'S ARGUMENT THAT KEY TERMS OF THE LSA FOR LOAN NO. 1A118E43 WERE THE PRODUCT OF SCRIVENER'S ERROR

Lastly, Appellant maintains that he is entitled to certain residual ETH.  The parties dispute two issues: (1) who was to have funded the relevant transaction; and (2) the proper amount of the ETH.

#### 1.    Who Was to Have Funded the ETH at Issue

Appellant contends that the relevant transaction was one for reinstatement, and that BlockFi was therefore responsible for funding it, not Appellant.  (Appellant Br. at 45.)  Appellant argues that the Bankruptcy Court therefore committed error when it found that Appellant had failed to provide evidence that *he* had deposited the ETH in question.  (*Id.* at 3, 22)  In rebuttal, BlockFi maintains that Appellant was supposed to deposit the ETH and failed to provide any evidence that he ever deposited it.  (Appellee Br. at 31.)

The Bankruptcy Court reasoned that Appellant offered no evidence that he deposited or transferred the ETH to his depository account, whereas BlockFi offered documentary evidence

showing that the missing ETH was never actually deposited.  (AR at 281–82.)  The Bankruptcy Court relied on an email between the parties that confirmed BlockFi's version of events.  (*Id.*)

Based on the limited record before it, the Court has two concerns regarding the Bankruptcy Court's rationale.  First, the decision on the Omnibus Objection does not appear to address Appellant's argument that he was never obligated to fund any portion of the "missing" ETH collateral because LSA 1a118e43 was part of a collateral reinstatement agreement, to be funded with existing collateral ETH from a prior loan plus additional collateral to be provided by BlockFi. The Bankruptcy Court appears to acknowledge that this is the posture of LSA 1a118e43 when it observes that:

> Specifically, an email between the parties confirms that "BlockFi will refinance the full payoff amount for [a prior loan] into a new loan backed by 3,580.172 ETH. This includes the 1565.2442 ETH purchased by BlockFi plus the existing 2,014.929 ETH on the loan."

(*Id.* at 282.)  The decision nevertheless faults Appellant for failing to establish that he had deposited the required ETH.  Because this is difficult for the undersigned to square with the nature of what was arguably a reinstatement transaction, the Court finds that this determination by the Bankruptcy Court would benefit from a further developed record.  This counsels in favor of remand as to this issue.

### 2.    What is the Amount of the ETH

Second, the Court has similar concerns regarding the *amount* of the ETH that is purportedly missing.  The opinion on the Omnibus Objection credits BlockFi's explanation that "because the value of the ETH increased during negotiations, BlockFi did not need to purchase 1,565.2442 ETH as contemplated in the email and, instead, purchased only 1320 ETH."  (AR at 282.)  But this was not the parties' pre-LSA agreement.  In the same email, BlockFi also more specifically stated that "*BlockFi will purchase 1565.2442 ETH on your behalf at prevailing market prices, which may*

21

*vary from current prices*, inclusive of any trading fees." (*Id.* at 128) (emphasis added). By this term, BlockFi committed to purchasing a quantity of ETH (not its dollar value equivalent) and explicitly recognized that it would be bearing the risk of market fluctuations in the value of ETH. It may also be relevant that LSA 1a118e43—which the parties entered into over a week after their email exchange—includes an integration clause at paragraph 22. (*Id.* at 73.) What effect, if any, this has on the parties' pre-LSA agreement is also unclear based on this record.

For each of these reasons, the Court finds that it is appropriate to remand to the Bankruptcy Court for further findings as to the parties' dispute regarding the issue of the purportedly missing ETH. Whether additional submissions from the parties or a hearing is needed, this Court leaves to the sound discretion of the Bankruptcy Court.

## V.    CONCLUSION

For the reasons stated above, the Court will **AFFIRM-IN-PART** and **REMAND-IN-PART** the Bankruptcy Court's Order Granting Wind-Down Debtors' Seventh Omnibus Objection as follows: this matter will be **REMANDED** for further findings by the Bankruptcy Court as to Appellant's entitlement to the purportedly missing ETH; the Bankruptcy Court's Orders Granting Wind-Down Debtors' Seventh Omnibus Objection to Claim No. 7233 and Denying Appellant's Motion for Reconsideration will otherwise be **AFFIRMED**. Additionally, Appellant's Motion to Stay (ECF No. 13) will be **DENIED AS MOOT**.


Date: April 14, 2025


                                    s/ Zahid N. Quraishi
                                    **ZAHID N. QURAISHI**
                                    **UNITED STATES DISTRICT JUDGE**